MELVIN A. SHORTESS, Justice Ad Hoc.*
Steven Zoerner (defendant), a 17-year-old male, was arrested at his home on April 6, 1979, on a charge of burglary and taken to the St. Tammany Parish Sheriff’s Office where he made inculpatory oral statements and gave a tape-recorded confession to the murder of John Bennett. The St. Tammany Grand Jury returned an indictment against defendant and Earnest Russell, a juvenile, on May 16, 1979, for first degree murder.
*605 Defendant filed a motion to suppress the confessions, alleging that the statements were given under the influence of fear, duress, intimidation, and threats. The motion was heard by Judge Hillary J. Crain on October 13, 1980, and denied.
Trial by jury was set for January 12, 1981, and Judge John W. Greene was to preside. A week before trial, defense counsel obtained certain exculpatory evidence and moved to reopen the motion to suppress. Judge Greene granted the motion to reopen and, as the trial progressed, combined the hearing on the voluntariness predicate for the confessions with the amended motion to suppress. The motion to suppress was again denied and the confessions were held to be voluntary and admissible, and were presented to the jury.
On January 14, 1981, defendant was convicted of second degree murder and sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. This appeal followed.
Defendant makes three assignments of error: (1) that there was insufficient evidence to support the probable cause necessary for the warrantless arrest of defendant in his home, and thus, the confessions were an inadmissible “fruit” of that illegal arrest; (2) that the State failed to carry its burden of proving beyond a reasonable doubt that defendant’s confessions were voluntary; and (3) that the trial judge should have stopped the alleged grossly improper arguments of the prosecutor.
We find that the second assignment of error has merit.
John Bennett went to his trailer lot on the night of April 3, 1979, apparently to check on business, but was attacked by robbers, stabbed over 100 times, and later died.
Defendant was bom on January 5, 1962, and was just 17 years old at the time of his arrest. He had a seventh-grade education but had spent half of one school year in Mandeville.[1] Officers arrived at his home at about 10:00 p. m. on April 6, 1979. Earlier that evening, police arrested Earnest Russell on a charge of burglarizing the home of Ronald Armstrong. With information from Russell, along with facts which they already possessed concerning defendant’s involvement in the Armstrong burglary, the police proceeded to the Zoerner residence to arrest defendant.
Several officers were present: Sergeant E. L. Herman and Deputy R. R. Reimonenq of the St. Tammany Parish Sheriff’s Office, Detective Charles Mulé, Detective Lionel Hicks of the Slidell Police Department, and possibly others. The arrest was not easy. After defendant and his parents were informed that he was under arrest for burglary, he had to be physically removed from the residence, dressed only in short pants, a tee shirt and socks. Herman’s account of the arrest is as follows:
Q At the time of his arrest, was there any altercation or scuffles?
A Yes, sir. There was.
Q Would you explain to the jury what occurred?
A When he was placed under arrest, his mother and father was in the home and said, “No, you are not taking my boy with you to jail.” I don’t remember if I took him by the right arm or left arm, but I grabbed one of his arms, twisted it, pulled him towards me, put his arm behind him and went out the door to the police car where he was handcuffed, patted down and put in the unit.
From his parents’ residence, defendant was taken to the Sheriff’s Office, where he was questioned in a small office in the back, known as the “deputy’s room.” Defendant signed a written waiver of his Miranda rights at 10:23 p. m., and by 12:05 a. m. he had given the oral statements and the tape-recorded confession.
At the pretrial motion to suppress before Judge Crain, Herman, Mulé, and Emily Holden, a juvenile officer, all testified that the confessions were voluntarily given and *606 that no abuse occurred.[2] The defense rested without calling any witnesses and the motion was denied.
Events then took a startling turn one week before trial. Hicks came forward and informed his superiors that defendant had been beaten by officers during the interrogation.[3]
When called by the defense on the amended motion to suppress, and again before the jury, Hicks testified that defendant was brought into the deputy’s room handcuffed behind his back; that Herman hit defendant in the stomach and said, “Okay, tell us about the man that you and Earnest Russell killed at the trailer park;” that defendant began crying and said, “Sir, I don’t know anything about killing anybody. I never killed anybody in the trailer park;” that Reimonenq grabbed defendant by the collar and threw him against the wall, demanding he get his story straight and stating, “We want to know the truth. We have already arrested the other person, and he has already confessed to everything;” that defendant again denied knowing anything; that Herman struck defendant in the stomach again and defendant bent over and began to moan; that questions were asked but if defendant did not answer the way the officers wanted him to, he was roughed up again; that this procedure continued for 15 to 20 minutes, until it was suggested that a tape-recorded statement be taken. Hicks stated that two tapes were made, but erased to avoid later detection of the numerous “stops and starts.” The third tape was made without stopping the recorder. Hicks commented:
They finally decided they would take a taped statement from him. I was present then, Detective Mulé — all during the course of this, I was present, Detective Mulé, Sergeant A1 Herman and Deputy Reimonenq and the accused. When they began to take the statement, Zoer-ner obviously didn’t have his facts together, as far as he didn’t know enough about the crime scene. He didn’t know as much as a person would have known had they been there.
The defendant took the stand and gave an account of the interrogation consistent with Hicks’ version, except he claimed it was Mulé, instead of Reimonenq, who, along with Herman, had beaten him.
Herman, Mulé, and Reimonenq denied abusing defendant, and suggested various reasons why Hicks would make such accusations. Assistant Chief Terry Parta and Sergeant Swann of the St. Tammany Parish Sheriff’s Office were at the station the night of the arrest, and both denied knowledge of any coercion or abuse.
The trial judge denied the amended motion to suppress, and in written reasons, stated:
The Court has nothing in this record to reflect badly or to impeach the testimony of Officers Herman, Mulé, Parta and Reimonenq. The Court is presented with testimony of those four officers, Officer Herman, Officer Mulé, Officer Parta and Officer Reimonenq, which directly, not indirectly, but directly conflict (sic) with the testimony of Officer Hicks.
*607 We recognize that the admissibility of a confession is a question for the trial judge and his conclusions with respect to the credibility and weight of testimony relating to the voluntariness of a confession will not be set aside, unless they are not supported by the evidence. State v. Fowlkes, 352 So.2d 208 (La.1977). The entire record, however, reveals that there was significant evidence to “reflect badly” on the testimony of Herman, Mulé, and Reimonenq.
At the pretrial motion to suppress with Judge Crane presiding, Herman testified as follows:
Q When you got down to the Sheriff’s Office, how did the subject of his statement come up? Did you ask him to give a statement, or did he volunteer that?
A He volunteered some of the information on the way to the office. And then at the office, he volunteered the statement. I asked him, of course, if he would be willing to give one.
And further,
Q When you took him down to the Sheriff’s Office in the police car, who was present in the police car?
A Myself, Detective Mule, Zoerner, and — I don’t — maybe they might have had another officer. I don’t know.
Q Was he questioned at all in the police car by yourself or by—
A Once we got him in the police car . .. once he got in the car, he fully cooperated with us. He freely talked with us.
Q What did he talk with you all about in the police car? Only the Armstrong burglary?
A He talked about the Armstrong burglary. He talked about this burglary and numerous other burglaries.
Q What’s this burglary?
A Armstrong burglary.
Q Okay, the Armstrong burglary.
A He talked about some of the other burglaries he pulled. He talked about Ernest Russell and what Ernest Russell had done in the burglaries. He talked about Ernest Russell killing a white man and stabbing him, and that the reason he did it was because — you know, different things why they had done it.
Q This was in the police car?
A This was right prior to getting out at the Sheriff’s Office.
Q In the police car?
A Yes, sir.
At the trial on the merits with Judge Greene presiding, Reimonenq directly contradicted Herman’s former testimony. Reimonenq testified:
Q Who transported him from his house to the Sheriff’s Office?
A I transported him.
Q Was there anyone else in your car other than Steven Zoerner and yourself?
A No, sir.
Herman also directly contradicted his own former testimony, apparently in an attempt to make his version of events coincide with Reimonenq’s, who had not testified at the pretrial motion to suppress. Herman testified as follows:
Q Other than this, officer, excuse me, let me ask you another question. From that point [the arrest at the residence] to approximately what period of time was Steven Zoerner in your custody?
A He was transported front there to the Sheriff’s Office in a marked caged unit by Deputy Reimonenq. I met them at the Sheriff’s Office, and I would say ninety percent, ninety-eight percent of the time. (Empnasis ours.)
These direct contradictions raise serious questions as to credibility and do “reflect badly” on the State’s evidence. And there are additional conflicts in the State’s case.
Defendant’s parents came to the Sheriff’s Office shortly after the arrest. They were directed to an area approximately 20 feet from the deputy’s room where their son was *608 being questioned. Both the mother and father testified that although they made requests, they were not allowed to see defendant, until after he had confessed to the murder.[4] Hicks testified that defendant was not allowed to speak with his parents before questioning.
Herman stated he believed defendant spoke to his parents before they actually took the tape-recorded statement, right after defendant was charged with murder.[5] Mule’, who, along with Herman, testified that he was with the defendant 99% of the interrogation time, stated that he did not believe the defendant spoke with his parents until after the tape recording. Emily Holden, on the other hand, testified that the defendant spoke with his parents not more than 20 minutes after he arrived at the station. Again, the State’s evidence was inconsistent and conflicting as to when defendant was allowed to speak with his parents.
Additionally, the trial judge found that the defendant’s parents were 20 feet away from the room where their son was being questioned; that Holden was in an office next door to the deputy’s room; and that the door to the deputy’s room was open, but that no one heard the defendant make any sound. He stated:
This court feels that even a moan by the defendant, which is what he said he did after being hit in the stomach, and certainly being thrown against the wall would make sufficient noise to alert either Sergeant Holden or the mother or father. The Court then is at a loss to explain how this abuse could have transpired without anyone knowing about it.
Again, the record reflects inconsistencies. Mulé testified that the door was closed during the taped statement, yet Holden stated, “. .. I don’t think the door would have been closed.” The defendant stated that he did not “holler” when he was punched in the stomach, but rather, “moaned.” This is consistent with Hicks’ statements that defendant’s response to the abuse was “a moan” and “crying.” Both Mulé and Herman admitted that during the questioning, defendant was crying, emotional, and upset, yet his parents did not hear anything to alert them. Further, there was a period of time when defendant was alone with the officers before his parents arrived.
The trial judge further commented: Detective Hicks said nothing about this abuse from April the 6th of 1979 to January 6th or 7th of 1981, . . . which is a period of twenty-one months without telling anyone this story. The Court recognizes that Detective Hicks is certainly sticking his neck out with this testimony.
Hicks had been with the Slidell Police Department for approximately five years. When he realized that he might be asked to testify as to the Zoerner confessions, he came forward and told his superiors that he would have to reveal what he knew about the abuse, if asked under oath. By so doling, Hicks placed his future and career in jeopardy.
La.R.S. 15:451 provides:
Before what purposes [purports] to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises.
We find that the circumstances surrounding defendant’s arrest were not favorable to a non-coercive environment which insures a voluntary statement. La.R.S. 15:451. He was only 17 years old, had a seventh-grade education, and a history of emotional problems. He was arrested, *609 without a warrant on a burglary charge, and forceably removed from his house in short pants, tee shirt and socks while his parents watched, unable to help. Within 20 minutes of arrival at the Sheriff’s Office, he had signed a written Miranda waiver. The testimony concerning his transportation to the Sheriff’s Office and his lack of access to his parents during the interrogation was conflicting and contradictory. Finally, his testimony of verbal and physical abuse was corroborated by the testimony of a police officer. This record, taken as a whole, indicates that the State failed to meet its burden of proving beyond a reasonable doubt that the defendant’s confession was voluntary and intelligently made. Defendant’s conviction is reversed and this case is remanded for a new trial consistent with this opinion.
REVERSED AND REMANDED.
MARCUS, J., dissents and assigns reasons.
CARTER, J., dissents.

 Judges Melvin A. Shortess, Burrell J. Carter, and Felix H. Savoie, Jr., of the First Circuit, Court of Appeal participated in this decision as associate justices ad hoc, joined by Chief Justice Dixon and Associate Justices Calogero, Marcus and Dennis.

. Southeast Louisiana State Hospital.

. The record shows that Herman and Mulé were with defendant during the questioning. Holden was in and .out of the interrogation room and in a small office next door. All three were present while the taped statement was taken. Hicks apparently was in the deputy’s room fór most of the questioning, but left during the taped statement. Reimonenq was present, at least at the beginning of the questioning. Hicks and Reimonenq were not called to testify at the original motion to suppress, but both testified at the trial on the merits.

. The record reveals that Hicks was in a meeting with the district attorney the week before trial. He received a phone call from defense counsel who informed him that he would be called as a witness for the defense, to testify concerning the confession of Donald Caraway to the Bennett murder. Caraway had confessed to killing a white man in Louisiana approximately a week after defendant was -arrested. Hicks and Mulé had gone to Connecticut to investigate. An arrest warrant was issued for Caraway and he was brought to Louisiana, but was subsequently released. Hicks informed his superiors that if he was questioned under oath about Caraway and the Zoerner confession, he would have to admit that officers had beaten Zoerner.

. Mr. Zoerner stated, “It may have been an hour or two or three,” before they saw Steven. Mrs. Zoerner stated, “It was 2:00 or 3:00 in the morning, maybe after that, because it was daylight before we got back home.” And after another question she said, “It was hours, three, four or five hours.”

. Herman added that he was not sure if defendant’s parents knew, before the taped statement, that their son was charged with murder.